640 So.2d 1084 (1994)
Quarry JONES, Petitioner,
v.
STATE of Florida, Respondent.
Erik RODRIGUEZ, et al., Petitioners,
v.
STATE of Florida, Respondent.
Nos. 81970, 81992.
Supreme Court of Florida.
May 26, 1994.
Rehearing Denied August 15, 1994.
James B. Gibson, Public Defender and James R. Wulchak, Chief, Appellate Div., Asst. Public Defender, Daytona Beach, and Billy H. Nolas, Sp. Public Defender and Julie D. Naylor, Ocala, for petitioners.
*1085 Robert A. Butterworth, Atty. Gen. and Joan Fowler, Sr. Asst. Atty. Gen., West Palm Beach, for respondent.
Nina E. Vinik, Miami, amicus curiae for the American Civ. Liberties Union Foundation of Florida.
David A. Henson of Kirkconnell, Lindsey & Snure, P.A., Winter Park, amicus curiae for Florida Ass'n of Crim. Defense Lawyers (FACDL).
McDONALD, Senior Justice.
We review Jones v. State, 619 So.2d 418 (Fla. 5th DCA 1993), which upheld the constitutionality of section 800.04, Florida Statutes (1991). The district court certified the issue to this court as a question of great public importance. Id. at 422. We have jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution. We approve the decision of the district court.
In case number 81,970, Quarry Jones, age eighteen, was charged and convicted of violating section 800.04, Florida Statutes (1991). Section 800.04 provides that any person who:
(1) Handles, fondles or makes an assault upon any child under the age of 16 years in a lewd, lascivious, or indecent manner;
(2) Commits actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sadomasochistic abuse, actual lewd exhibition of the genitals, or any act or conduct which simulates that sexual battery is being or will be committed upon any child under the age of 16 years or forces or entices the child to commit any such act;
(3) Commits an act defined as sexual battery under s. 794.011(1)(h) upon any child under the age of 16 years; or
(4) Knowingly commits any lewd or lascivious act in the presence of any child under the age of 16 years,
without committing the crime of sexual battery, commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. Neither the victim's lack of chastity nor the victim's consent is a defense to the crime proscribed by this section.
At trial Jones was denied the opportunity to raise consent as a defense. The court sentenced him to four and one-half years' imprisonment, to be followed by six months' probation. The district court affirmed the conviction.
In case number 81,992, Rodriguez, age nineteen, and Williams, age twenty, were also charged with violating section 800.04. The parties stipulated at trial that the girls with whom the defendants had sexual intercourse were fourteen years of age and consented to having intercourse. Neither girl desired to prosecute and the charges were instituted by the sister in Rodriguez and by the mother in Williams. The trial court held section 800.04 unconstitutional as applied and the district court reversed. The district court certified the issued to this Court as one of great public importance.
We first address the merits of the State's argument that the petitioners do not have standing to assert the claimed privacy rights of the girls with whom they had sexual intercourse. In Stall v. State, 570 So.2d 257 (Fla. 1990), cert. denied, 501 U.S. 1250, 111 S.Ct. 2888, 115 L.Ed.2d 1054 (1991), we held that the sellers of obscene materials had vicarious standing to raise the privacy rights of their customers. The petitioners in the instant case, like the sellers in Stall, stand to lose from the outcome of this case and yet they have no other effective avenue for preserving their rights. State v. Saiez, 489 So.2d 1125 (Fla. 1986). Therefore, the petitioners have standing to attack the constitutionality of the statute under which they were prosecuted. See, e.g., Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).
As evidenced by the number and breadth of the statutes concerning minors and sexual exploitation, the Florida Legislature has established an unquestionably strong policy interest in protecting minors from harmful sexual conduct.[1] As we stated *1086 in Schmitt v. State, 590 So.2d 404 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1572, 118 L.Ed.2d 216 (1992), "any type of sexual conduct involving a child constitutes an intrusion upon the rights of that child, whether or not the child consents ... [S]ociety has a compelling interest in intervening to stop such misconduct." Id. at 410-11. In Schmitt the issue involved the constitutionality of a statute making it unlawful to possess material depicting sexual conduct by children. The issue in the instant case involves the constitutionality of a statute making it unlawful to have sexual intercourse with a child under the age of sixteen. In both of these cases, the State intervened in an effort to protect the health, safety, and welfare of children who are inevitably vulnerable to the sexual misconduct of others.
The district court stated that it would seem "disingenuous" to rely on Schmitt for the conclusion that "anytime a minor is seduced, sexual exploitation has occurred." 619 So.2d at 420 n. 2. We are of the opinion that sexual activity with a child opens the door to sexual exploitation, physical harm, and sometimes psychological damage, regardless of the child's maturity or lack of chastity. Therefore, in the instant case, it is appropriate to consider the child protection policies discussed in Schmitt. The petitioners argue that the statute is unconstitutional as applied because the girls in this case have not been harmed; they wanted to have the personal relationships they entered into with these men; and, they do not want the "protections" advanced by the State. However, neither the level of intimacy nor the degree of harm are relevant when an adult and a child under the age of sixteen engage in sexual intercourse. The statutory protection offered by section 800.04 assures that, to the extent the law can prevent such activity, minors will not be sexually harmed. "[S]exual exploitation of children is a particularly pernicious evil that sometimes may be concealed behind the zone of privacy that normally shields the home. The state unquestionably has a very compelling interest in preventing such conduct." 590 So.2d at 410.
The State has the prerogative to safeguard its citizens, particularly children, from potential harm when such harm outweighs the interests of the individual. Griffin v. State, 396 So.2d 152 (Fla. 1981).
Despite its intimate character, sexual conduct is highly regulated activity. At any given point, the picture that emerges of the complex web of legal regulation is impressionistic, and some features are difficult to discern. The law of sex, however, can operate as a value generating force when those who create or who are governed by it perceive in the law an underlying vision of appropriate sexual conduct.
Martha Chamallas, Consent, Equality, and the Legal Control of Sexual Conduct, 61 S.Cal.L.Rev. 777, 777 (1988). The legislature enacted section 800.04 based on a "morally neutral judgment" that sexual intercourse with a child under the age of sixteen, with or without consent, is potentially harmful to the child. Stall, 570 So.2d at 261 (quoting Paris Adult Theater I v. Slaton, 413 U.S. 49, 69, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973)). Although the right to be let alone protects adults from government intrusion into matters relating to marriage,[2] contraception,[3] and abortion,[4] the State "may exercise control over the sexual conduct of children beyond the scope of its authority to control adults." Anderson v. State, 562 P.2d 351, 358 (Alaska 1977) (upheld statute prohibiting fellatio with a child under sixteen years of age, regardless of consent).
The petitioners contend that section 800.04 should be struck down given our decision in In re T.W., 551 So.2d 1186 (Fla. 1989), in which we held that the right to privacy encompasses a minor's right to terminate a *1087 pregnancy. Under the statute at issue in T.W., a minor was permitted to consent without parental approval to any medical procedure involving her pregnancy or her existing child, except abortion. We recognized in T.W., for example, that a minor could be authorized to order life support discontinued for a comatose child. Id. at 1195 (citing In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984)). Thus, the rationale for declaring a right of privacy in T.W. was based on the fact that a minor possessed a right of privacy with respect to other types of medical and surgical procedures. T.W. did not transform a minor into an adult for all purposes.
The rights of privacy that have been granted to minors do not vitiate the legislature's efforts and authority to protect minors from conduct of others. We agree with Judge Sharp and the legislature that Florida has an obligation and a compelling interest in protecting children from "sexual activity and exploitation before their minds and bodies have sufficiently matured to make it appropriate, safe and healthy for them." 619 So.2d at 424 (Sharp, J., concurring specially). Accordingly, we approve the decision of the district court upholding the constitutionality of section 800.04, Florida Statutes (1991), affirming the conviction in Jones, and remanding Rodriguez and Williams for appropriate action.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW and HARDING, JJ., concur.
KOGAN, J., concurs with an opinion.
KOGAN, Justice, concurring.
The case before us involves an issue so distinct from In re T.W., 551 So.2d 1186 (Fla. 1989), that I am somewhat surprised this question ever became so confounded. I have considerable difficulty understanding how the privacy interests discussed in T.W. could be extended to the present facts. As I noted in Schmitt v. State, 590 So.2d 404, 418-19 n. 17 (Fla. 1991) (Kogan, J., concurring in part, dissenting in part), cert. denied, ___ U.S. ___, 112 S.Ct. 1572, 118 L.Ed.2d 216 (1992), the issue before the Court in T.W. was the constitutionality of the state taking actions that tended to force some adolescents to continue pregnancies without also affording them an adequate level of judicial review. In effect, such action required some adolescents to face the "enormous personal, medical, familial, psychological, and financial concerns and risks that will fundamentally change an adolescent's entire life" without due process.[5]Id.
This conclusion was especially compelling in light of the fact that the state in T.W. had been very inconsistent: It still permitted adolescents to consent to or withhold consent for medical procedures even though the inevitable result was termination of a pregnancy, provided the procedure was not what commonly is described as an "abortion." T.W., 551 So.2d at 1198-99 (Ehrlich, C.J., concurring specially). Such a surprising degree of self-contradiction revealed the state's scheme to be not only uncompelling, but very nearly irrational. The state in effect had allowed adolescents to obtain much the same result by less controversial methods while greatly restricting access to another more politically unpopular procedure.
*1088 If anything, the present case presents the reverse side of the issue posed by T.W. What is most at stake here is legalizing the sexual exploitation of children and young adolescents,[6] because that is one result that must inevitably follow if the statute is stricken in its application or otherwise. As the fragmented district court below seems to have concluded, the right of privacy in no sense authorizes such behavior. I also have reached essentially the same conclusion in an earlier opinion on a highly similar question of law:
[T]he state's intervention in this setting is designed to prevent harmful physical and psychological effects of which the child may be wholly unaware. The state's interest in preventing such harm thus clearly outweighs whatever "right" children may have in consenting to this type of exploitation.
Schmitt, 590 So.2d at 418-19 n. 17 (Fla. 1991) (Kogan, J., concurring in part, dissenting in part).
In sum, the opinion in T.W. held that a young adolescent cannot be required to confront the wide-ranging risks of a pregnancy absent sufficient due process and consistency in the law. By the exact same rationale, the state in the present case can prevent children and young adolescents from being exposed to the wide-ranging risks associated with sexual exploitation and premature sexual activity. State actions that may force an already-pregnant minor to confront the risks of a pregnancy are quite a distinct issue from state actions that tend to enforce celibacy among the very young, thereby avoiding the risks inherent in premature sex  including unwanted or dangerous pregnancies.
In both cases, the sole question is achieving what is best for young people in light of the state's reasons for and consistency in imposing the restrictions it has chosen. Florida clearly has not been inconsistent in preventing sexual exploitation of unemancipated minors under the age of sixteen. Indeed, the vast array of child abuse, neglect, and exploitation statutes, as well as the strict criminal penalties for child pornography, show consistency of high magnitude. This Court has upheld statutory schemes that revealed a good deal more inconsistency than this one.
I am deeply troubled that an uncritical acceptance of the notion of youths "consenting" to sexual activity will merely create a convenient smoke screen for a predatory exploitation of children and young adolescents. This problem is not slight. Some studies, for example, indicate that 5 to 9 percent of males and 8 to 28 percent of females in the general population report that they were sexually exploited as youths. Gordon C. Nagayama Hall, et al., Sexual Aggression Against Children: A Conceptual Perspective of Etiology, 19 Crim.Just. & Behav. 8, 8-9 (1992) (citing David Finkelhor, Child Sexual Abuse: New Theory & Research (1984)). Medical science already has compiled an impressive body of evidence showing just how staggering the cost of this exploitation is to each and every one of us.
For example, some researchers have documented the way in which childhood or early adolescent sexual exploitation can cripple a person throughout adult life, sometimes even resulting in psychiatric disorders of the gravest character. Lenore Terr, Too Scared to Cry: Psychic Trauma in Childhood (1990). Other studies have documented the link between exploitation of girls and those same girls being lured into a life of prostitution. Report of the Florida Supreme Court Gender Bias Study Commission, 42 Fla.L.Rev. 803, 894-905 (1990).
Still other studies have concluded that exploitation of youths contributes to juvenile delinquency or other more serious criminal or violent activity, even many years after the fact. Mic Hunter, 1 The Sexually Abused Male 107-08 (1990); David Tingle, et al., Childhood & Adolescent Characteristics of *1089 Pedophiles & Rapists, 9 Int'l J.L. & Psychiatry 103, 115-16 (1986); Brandt V. Steele, et al., A Psychiatric Study of Parents Who Abuse Infants & Small Children, in The Battered Child 103, 111 (Ray E. Helfer, et al., eds., 1968); David M. Greenberg, et al., A Comparison of Sexual Victimization in the Childhoods of Pedophiles and Hebephiles, 38 J. Forensic Sci. 432, 432 & 435 (1993).

I. Can Children & Young Adolescents "Consent" to Sex?
Given the grave risks at stake here, I think this Court must look very very carefully at the notion of children and young adolescents "consenting" to sex. And I think any careful examination of this question reveals it to be a slippery slope of the worst magnitude. If T.W. is read as abrogating Florida law on the age of consent apart from the facts of that case then countless other legal problems immediately arise. Such a loose reading of T.W. potentially would mean that children of a young age could enter into contracts even if they lack the experience or means to do so; could marry at a very young age without parental or judicial consent; could purchase and consume tobacco and alcoholic beverages; could attend adult movies and purchase pornography; and much else. Nothing in T.W. supports these troubling scenarios.
Moreover, even those who sincerely argue that T.W. authorizes minors to consent to sex surely must concede that some minimum age exists at which a minor simply is incapable of consenting. I cannot believe, for example, that any responsible adult seriously thinks a six-year-old legally could consent to sex. Children of that age always lack the experience and mental capacity to understand the harm that may flow from decisions of this type. They may unwittingly "consent" to something that can ruin their lives, jeopardize their health, or cause emotional scars that will never leave them. I think most concerned adults and experts in the field would agree that this lack of prudent foresight continues in youths well into the teen years.
Moreover, well established law makes it necessarily irrelevant whether the underage persons in this or any other case had sufficient "maturity" to consent to sex. If the legislature or this Court created a "maturity exception" to the present statute, I think the statute then would be subject to a serious challenge on grounds of constitutional vagueness. Maturity is a concept about which even experts strongly disagree, and conceptions of maturity differ widely in the general population.
The difficulty of defining "maturity," for example, has been noted in the context of teens seeking judicially approved abortions. Katherine M. Waters, Judicial Consent to Abort: Assessing a Minor's Maturity, 54 Geo.Wash.L.Rev. 90, 109-17 (1985). The difficulty is magnified a thousandfold in the present context: Here, the courts would be required to deal not only with the actual "maturity" of the minor as gauged by a judge, but also with the defendant's perception of the youngster's maturity and the degree to which the statute reasonably has put the defendant on notice that the specific sexual act was illegal. Determining "maturity" in this setting can only be an insurmountable problem: At each level of the analysis it involves subjective impressions and poorly definable terminology  difficulties greatly enhanced by the constitutional rigors imposed on criminal laws.
A maturity exception thus would enfeeble the statute. A defendant could argue that the statute provides insufficient notice of the proscribed conduct, thereby rendering it facially void for vagueness. See State v. Ferrari, 398 So.2d 804, 807 (Fla. 1981) (statute is unconstitutionally vague if persons of reasonable intelligence must guess what conduct is proscribed). A court then could be constitutionally required to accept that argument under federal or Florida law and strike the entire statute. In that way, a maturity exception could result in all minors  even those of very tender age  receiving no protection whatsoever from the statute.
I therefore think the legislature is both reasonable and prudent in creating a bright-line cut-off at a specific age. There most probably is no better way of eliminating the vagueness problem.
In other words, the legislature has acted pursuant to its authority to protect children *1090 and young adolescents when it set the age of consent for present purposes at sixteen. The legislature, I believe, can choose any age within a range that bears a clear relationship to the objectives the legislature is advancing. Some reasonable age of consent must be established because of the obvious vulnerabilities of most youngsters and the impossibility of legally defining "maturity" for allegedly precocious teens in this context. Because an age of consent is necessary, there is no good reason why the legislature cannot set it at sixteen for present purposes, which clearly is reasonable in light of the available psychological and medical literature.
Furthermore, the concept that children and young adolescents can "consent" to sexual activity is highly problematic on a purely psychological level: It ultimately rests on the mistaken assumption that children and young adolescents think the same way adults do and thus can make a meaningful choice in sexual matters. Because of this assumption, some adults erroneously conclude that a young person who did not actively resist or who seemed to have agreed to sex has consented  a notion that uncritically accepts the same general excuses many molesters offer for their misconduct. In this way the victim is given the blame. A widely-cited psychological study strongly indicates how wrongheaded these notions are.
In 1983, Dr. Roland C. Summitt[7] described how young people of either gender can be entrapped in continuing sexual exploitation that may seem to be consensual from an adult perspective, but that is not actually so when the psychological differences of children and young adolescents are taken into account. Youngsters suffering exploitation, Summitt said, commonly fail to disclose the sexual activity for a variety of reasons, including fear of the abuser and shame. These children or adolescents typically are overwhelmed by helplessness and thus may effectively be coerced into accommodating the abuser's sexual demands, partly because they may believe they must do whatever an adult tells them. Sexually exploited youths often fail to make any disclosure of their victimization for long periods of time, which erroneously leads some adults to believe that the children or adolescents "consented": In actuality, they commonly are afraid, have been threatened, lack the vocabulary to even describe what has happened, or are simply too ashamed to tell anyone. Children or young adolescents also may be directly or inadvertently pressured into retracting claims of sexual exploitation they have made, leading some adults to believe the youngsters are unreliable. Roland C. Summitt, The Child Sexual Abuse Accommodation Syndrome, 7 Child Abuse & Neglect 177 (1983).
In other words, what may appear to an adult to be consent or accommodation actually can be the desperate reaction of a young person who genuinely feels trapped, intimidated, and helpless.[8]
Another expert has noted an analogous though slightly different problem peculiar to sexual exploitation of young males. In this context, too, scientific study indicates that any focus on "consent" misses the point:
In many cases, the duration and nature of sexual encounters between a male child and his perpetrator bear the external trappings of consensual contact. Like a veil, the notion of consent conceals the underlying coercion and manipulation experienced by the victim. Loss of control, or being overpowered, a familiar theme of girls and women who have been sexually abused, may be emotionally inaccessible or inapplicable to male victims. The dynamic of vulnerability lies outside the emotional vocabulary of many "normal" males.
*1091 Mic Hunter, supra, at 77. In many cases, the boys may view themselves as somehow being "guilty" for what has happened: They cannot concede that they were victims who had lost control of a disturbing situation  something many boys view as unmasculine. Id. at 79. For this reason, there may be serious under-reporting of abuse directed at young males. Id. at 91.
In light of the foregoing, I cannot see how the state's interest in preventing sexual exploitation early in life is anything less than compelling. This is not a case about anyone imposing a particular view of morality on others; rather, it is a case about what psychological science, sound policy, and constitutional law show to be essential for the protection of our young people. Beyond any question, the statute at issue here is a valid exercise of the state's powers.

II. The "Precedent" of T.W.
On another relevant point, I must express some surprise at the rather widespread practice in Florida of referring to a "majority opinion" in T.W. In actuality there was no "majority opinion" at all. The views of the Justices in T.W. were divided into five separate opinions, none of which garnered the four votes necessary to constitute a precedential "opinion" under the Florida Constitution. Art. V, § 3(a), Fla. Const.; Santos v. State, 629 So.2d 838 (Fla. 1994).
Rather, the "decision"[9] of T.W. may be fairly described as three general holdings on which a majority agreed, albeit in piecemeal form in five separate opinions: (a) All seven justices agreed that adult women have a right to terminate a pregnancy during the earlier stages, as described in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); (b) at least six justices agreed that Florida's parental consent statute[10] read in its literal sense was unconstitutional, though two of the six felt that the deficiencies properly could be corrected through a judicial narrowing construction; and (c) at least four Justices  and possibly all seven  agreed that minors do not share the same degree of privacy rights adults possess. T.W., 551 So.2d at 1186-1205 (separate opinions). Beyond these three points, there was no "majority" view.
The last of the three holdings of T.W. has gone unnoticed by a considerable number of persons, apparently because it was contained chiefly in the four separate opinions appended to the plurality. For example, in his "specially concurring" opinion[11] Justice Ehrlich wrote:
I recognize that in cases involving minors, the state has an additional interest in protecting the immature minor and the integrity of the family.
Id., at 1198 (Ehrlich, C.J., concurring specially). In this vein, Justice Ehrlich felt that it would be possible for the state to impose at least some restrictions on abortions for minors that would be impermissible for adults. Id. at 1199-1201. Similar views were reiterated by Justice Overton, with Justice Grimes concurring:
[A] minor has the disability of nonage, including the inability to contract... . Our right of privacy provision ... did not absolutely remove a minor's disability of nonage ... and those parts of the majority *1092 opinion in which I have concurred did not, in my view, so hold.
Id. at 1201 (Overton, J., concurring in part, dissenting in part). Likewise, Justice Grimes stated:
[T]he constitutional rights of children may not be equated with those of adults... .
Id. at 1202 (Grimes, J., concurring in part, dissenting in part).[12] Finally, Justice McDonald noted:
[T]he judiciary does not have the power to extend the capacity to consent by a minor beyond that granted by the legislature.
Id. at 1205 (McDonald, J., dissenting).
In sum, at least four members of the Court agreed that minors do not have privacy rights equal to those of an adult, though there was no four-vote agreement on the actual extent of the minors' rights. I personally do not view this general conclusion as inconsistent with the plurality, which largely left the issue unaddressed. However, the plurality did note that "a minor's rights are not absolute."[13]In re T.W., 551 So.2d 1186, 1193 (Fla. 1989) (plurality opinion).
There is language in the opinions below that perhaps may suggest to an uncareful reader that T.W. gave minors the same right of consent that adults possess in sexual matters. Any persons who make that assumption should engage in a more precise reading of the three separate opinions below and of the five separate opinions in T.W. The views of Justices Ehrlich, Overton, Grimes, and McDonald plainly show that T.W. has never supported the proposition that all minors have the same degree of privacy rights as adults. T.W. certainly and emphatically does not mean that all minors can consent to sex as though they were adults.

III. Conclusions
There is no other reasonable conclusion: This statute comports with every requirement imposed by the Constitution, is justified by the weightiest of reasons, and shows not one fragment of inconsistency with other related Florida laws. The actual "decision" in T.W. is not on point with this case either legally or factually, and never has been. I therefore concur with the majority.
NOTES
[1] See, e.g., § 794.011, Fla. Stat. (1993) (making it a felony of varying degrees to commit a sexual battery on a minor); id., § 847.013 (prohibiting the sale or loan of videotapes depicting sexual conduct to minors); id., § 847.0133 (prohibiting the distribution of obscene materials to minors); id., § 847.0145 (prohibiting the sale or custodial transfer of minors with knowledge that they may be involved in portraying or engaging in sexually explicit conduct).
[2] Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).
[3] Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).
[4] Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
[5] It deserves emphasizing that T.W. did not directly or indirectly address the propriety of teens engaging in sexual activities. The T.W. Court was concerned solely with the distinct question of what happens once a young girl already is pregnant. Some have argued that recognizing a minor's right to an abortion, however limited that right may be, necessarily means there is a corresponding right for minors to engage in "consensual" sex. Such an argument is no different than saying that, because minors have a right to consent to alcohol- and drug-abuse treatment, § 397.601, Fla. Stat. (1991), they also must have a right to consume alcohol and ingest drugs in the first instance. This is an insupportable brand of logic. Absent sound reasons to the contrary, we do not deny substance-abusing children the treatment available to adults merely because of the youthful folly of becoming addicted. Nor do we thereby condone the folly itself. Likewise, sex in early adolescence is a dangerous folly that the state clearly does not condone; but once a girl is pregnant, very different issues and dangers of a completely different magnitude arise. T.W., in sum, does not create a right for young adolescents to "consent" to sex.
[6] I recognize that some of the parties attempt to distinguish "consensual" sex with minors from "exploitation." For reasons more fully developed in Part I. below, I must respectfully disagree. The relevant psychological literature strongly indicates this is a distinction without a difference in the case of children. Moreover, the question of "consent" is bound up with the problem of a minor's "maturity," which also is highly problematic in the present context for reasons noted below in Part I.
[7] When his study of this subject was issued, Dr. Summitt was clinical assistant professor of psychiatry at the Harbor-UCLA Medical Center in Torrance, California.
[8] I recognize that child sexual abuse accommodation syndrome has been controversial in other states when used to help prove child sexual exploitation in a criminal context. E.g., State v. Foret, 628 So.2d 1116 (La. 1993). However, the controversy stems in part from the unusually severe burden of proof the state must shoulder in a prosecution or from the strict procedural rules of a criminal trial, which may differ from Florida's. Dr. Summitt's study is widely respected on a psychological and sociological level. It thus has strong value for present purposes, where I am attempting to identify the broader societal impact of childhood sexual exploitation.
[9] We have noted elsewhere that a "decision" is the result or results approved by at least four members of the Court in a case. An "opinion," which is the analysis supporting a decision, can constitute precedent only to the extent at least four Justices have concurred in it. Santos v. State, 629 So.2d 838 (Fla. 1994). It thus is possible for a case to result in a "decision" even if there is no "majority opinion," as happened in T.W.
[10] The statute required parental consent before a minor could obtain an abortion, subject to some exceptions. See § 390.001(4), Fla. Stat. (Supp. 1988).
[11] By customary practice of the Court, a "specially concurring" or "concurring specially" opinion is one in which a Justice elaborates on or explains some aspect of the plurality or majority opinion to which it is attached. A specially concurring opinion also sometimes may express reservations about some aspect of the plurality or majority's analysis, as Justice Ehrlich did. When this happens with a plurality opinion, there obviously is no fourth vote and thus no binding "decision" or "opinion" with respect to any portion of the plurality about which the specially concurring opinion has stated a reservation. However, a specially concurring opinion typically agrees with the result and general thrust of the plurality or majority, as Justice Ehrlich's did.
[12] Justice Grimes at one point did state his belief that a majority of the Court "has said that the state's interest in regulating abortions is no different with respect to minors than it is with adults." In re T.W., 551 So.2d 1186, 1203 (Fla. 1989). That is true if the particular facts of T.W. are taken into account, especially the inconsistency in the relevant statutes that helped sway Justice Ehrlich. However, it remains clear that at least four members of the Court agreed that the privacy rights of children and adults are not coequal in every situation.
[13] Some have noted that T.W.'s plurality recognized that minors possess constitutional rights. This certainly is true. But many seem to have overlooked that the plurality did not say whether the rights were as broad as those of adults or what the scope actually was. I agree that constitutional rights of minors are not nugatory. Rather, they are subject to the degree of diminishment necessary to provide children the protection required by their diminished ability to make considered and meaningful choices in light of the state's interests and the law's consistency. This is peculiarly true for the right of privacy, which by its very nature protects the right of choice in matters of personal life. That right necessarily must be diminished to the extent that a considered and meaningful choice is not possible, which certainly is the case with children becoming involved in sexual activity.