668 So.2d 639 (1996)
STATE of Florida, Appellant/Cross-Appellee,
v.
Stephen Allen SMITH, Appellee/Cross-Appellant.
No. 94-2682.
District Court of Appeal of Florida, Fifth District.
February 16, 1996.
*640 Robert A. Butterworth, Attorney General, Tallahassee, and Timothy D. Wilson, Assistant Attorney General, Daytona Beach, for Appellant/Cross-Appellee.
Alexander Zouzoulas and Lori Wheeler, of Zouzoulas & Wheeler, P.A., Orlando, for Appellee/Cross-Appellant.
GRIFFIN, Judge.
The State of Florida ["State"] appeals the downward departure sentence of appellee, Stephen Smith ["Smith"], after conviction of two counts of committing a lewd act upon a child. On cross-appeal, Smith seeks reversal on the basis of certain defects in the information, which we find to be without merit. We are obliged to agree with the State, however, that the lower court erred in departing downward in sentencing Smith.
The State charged Smith by information with three counts of committing a lewd act upon a child under the age of sixteen by: 1) penetrating her vagina with his penis; 2) penetrating her anus with his penis; and 3) penetrating her vagina with his finger.
The victim testified at trial that on October 14, 1993, when she was age thirteen, she was in her sister's backyard playing on a trampoline with Josh Frost (her boyfriend), Gill Anderson, age seventeen, and Billie Evans, age sixteen. The victim had previously dated Evans. She and Frost had been alone earlier in the day during which time they had kissed and Frost had touched her breasts, but Frost eventually left. The victim acknowledged kissing Evans on the cheek.
Anderson and Evans began asking the victim if they could perform cunnilingus on her. She was uneasy because she had never had anyone do that to her before. After they asked her for a third time, she acquiesced saying, "Okay, I guess." As she pulled her pants down, Frost's brother, Smith, appeared. The victim had a crush on him at the time. She quickly pulled her pants up, after which Smith said to her, "If you really want to do something with these boys, we'll just all pull our pants down right here and have a little foursome." She was uncomfortable but she finally said she would. She explained that she had complied because she liked Smith and she felt special because he was older and he liked her.
Anderson first performed cunnilingus on the victim but she did not like it so he stopped. She testified that "Billie [Evans then] began ..." but stopped because it was not doing anything to her. Smith said, "Maybe if I give her a little more something to be excited about, maybe she'll like it" after which he put his finger in her vagina. After a minute or so, he stopped because she did not like it. She testified that Smith "began about wanting to have sex" with her. Evans asked her to perform fellatio on him but she refused. She did, however, fondle his penis. When he asked her to have sex with him, she said she expressed doubt. Because he was unable to achieve an erection, he pulled his pants up. At Smith's order, Evans and Anderson left, after which Smith asked the victim if he could have sex with her. She agreed because she liked him. As she kneeled on the trampoline, Smith placed his penis in her vagina from behind. A condom had been left behind by one of the other boys, but Smith did not use a condom.
Smith next coaxed the victim into allowing him to place his penis in her anus. She was initially hesitant because she had heard that it would hurt. As he proceeded to enter her, she began crying because it hurt. She lay flat on the trampoline and begged him to stop. He said, "Shut up you stupid bitch" and continued. Evans appeared and said that Frost was coming out so Smith got off the trampoline and the victim pulled her pants up. She began to go into her sister's house at which time Smith "started begging apologies" ... saying, "I'm sorry, I'm sorry, I didn't mean to say that." He then put her on the ground and "finished having sex" with *641 her by placing his penis in her vagina "through the front."
The victim went to bed that night without telling anyone what had happened. The next day, she told her cousin Leona because she was scared and needed to tell someone. Her mother found out the same day and the police were called. She was examined at Orlando Regional Medical Center that night.
Dr. Gregory Moses, a doctor at Orlando Regional Medical Center, was accepted by the trial court as an expert in the area of forensic rape exams. Moses testified that he had spoken with the victim alone on October 16, 1993 at 3:00 a.m. She was calm and collected at the time. The victim told Moses that she had engaged in consensual intercourse and that her partner had ejaculated twice. She also told him that digital penetration had occurred and that she had engaged in consensual cunnilingus with two other individuals but that she had not had sexual intercourse with them.
During his examination of the victim, Moses observed two injuries which he described as follows:
Basically I saw two types of injuries. One was in the vagina, which was an injury of a scarring type nature in the area of the hymen. The hymen in this young lady was absent, but there was an area of previous scarring in that area.
Also, I noted an area of injury in the anal-rectal area, which is the junction of the skin to the last portion of the large intestines, which was a little superficial, what we call laceration. But it really basically was a little cut that extended in several different directions and we call this stellate or star-type injury, which is consistent with a penetrating kind of injury.
Blood clot material showing recent bleeding suggested that the latter injury had probably occurred within the previous twenty-four to thirty-six hours. Moses acknowledged that sexual intercourse limited to between a minute to a minute and one-half was consistent with stellar injury.
Smith testified and denied that any act with which he had been charged had occurred. At the conclusion of the trial, the jury found him guilty of two of the counts but not guilty of the third count involving digital penetration.
At sentencing, the guidelines scoresheet reflected Smith had a prior record consisting of a variety of misdemeanors and four third-degree felony convictions for uttering forgeries. Smith's mother testified at the sentencing hearing that she had been the complainant in the forgery case. She explained:
Yes. And, your honor, if I may, being a mother, it's very, very tough. I do believe in trying to raise my children properly, if they do something wrong, make them pay for the crime.
Stephen did do something wrong, it was in the family. It was my checks that he got hold of. It was my account that got messed up. None of the merchants that the checks were written to were out any money. I was the only person out that money.
I worked to try to press charges in the beginning because I tried to use the tough love, if you will, he needed to learn a lesson.
At the same time throughout, it took a year, year and a half, I think, I don't know the whole time, for it to come from fruition all the way through going to court. And in that time Stephen did pay back every single bit of that money that he owed me.
He made a mistake. I even tried to work with the state attorney's office before it came to court to drop the charges, and they persisted, so it was rather odd in the fact that when Stephen did come to trial, I'm prosecuting him yet I'm sitting here defending him.
I think he learned a lesson. I think he learned a lesson hard, but it was meant as a mother trying to teach a son something. It was not like an armed robbery to 7-Eleven, for instance.
If I had to do it again today I wouldn't press charges, I would keep it a family matter and an out of court matter. And I would hope you don't hold that against him.
I know you've got to add these points for felonies and so forth, but it was strictly a *642 family matter and nobody was out any restitution but me as far as the monies, like I said, when he wrote these checks. And the checks went through, in other words the merchants got their money for it.
Smith's sentencing guidelines scoresheet totalled 415 points yielding a recommended sentence of twelve to seventeen years and a permitted sentence of nine to twenty-two years' incarceration. At the conclusion of the sentencing hearing, the trial court entered a downward departure sentence of five and one-half years concurrent incarceration for each count followed by a five and one-half year period of probation. The court explained:
This is a downward departure sentence. The basis for the departure is the following. The court finds the victim was engaged in consensual acts with others immediately prior to having consensual sex with the defendant.
* * * * * *
Also, the defendant's prior record, particularly for the four felonies which show in his prior record, were relatively minor events which the victim's mother indicated were prosecuted to teach the defendant a lesson. The basis the court will depart downward in this case.
Specifically, I don't believe the chaste, the allegation of the unchaste character of the victim, by statute, I don't believe should have anything to do with the court's decision to mitigate in this decision.
And absent there being some sexual contact between this child and other people immediately at the time of the defendant here on the scene, the court would find she had sex with other people would have any bearing on the issue. It's the context in which this arises that forms the basis for the departure.
* * * * * *
The way I've arrived at this sentence, I took the points off the score sheet for the forgeries, to begin with, and looked at the cell he fell in as a result of that.
Frankly, I went down another cell from that, and sentenced him in the permitted range another cell down from that.
This is a hard case. It's a really hard case. It's not easy, and that's why the jury has struggled with it.
The problem the case gave me, and I'm sure what the jury felt, as well, is that this would be a real easy case to send Mr. Smith to community control and probation, had he stopped when she said stop.
The problem is the jury apparently believed, and that I'm bound to believe, since the jury is the fact finder thatwell, perhaps not, there is an interpretation, but I'm certainly convinced as well, when she said stop, he didn't, and that's the part that really bothers the court and the part that warrants prison time having heard the testimony and evidence in the case.
The court wrote the following reasons for departing on Smith's scoresheet:
Victim was engaged in consensual acts with others immediately prior to having consensual sex with Defendant. Also, Defendant's prior record, particularly the four felonies were relatively minor events which the victim, his mother, has indicated were only prosecuted to teach Defendant a lesson.
Smith concedes that the trial court's second reason for its downward departure sentence is legally insufficient. At issue is the legal sufficiency of the court's first reason for departing. The state contends that the fact that the victim engaged in consensual acts with Evans and Anderson immediately before having consensual sex with Smith is not a valid reason for the court's downward departure from the sentencing guidelines after conviction of crimes to which consent is not a defense.
The State concedes that the victim's conduct with Evans and Anderson in Smith's presence before she had sexual intercourse with Smith was consensual but contends there is a distinction between the acts of cunnilingus in which she engaged with Evans and Anderson and the acts of sexual intercourse in which she engaged with Smith. Additionally, it emphasizes that the victim *643 was a thirteen-year-old female who had a crush on an adult male. According to appellant, Smith took advantage of the victim by first talking her into allowing Evans and Anderson to engage in sex acts while he watched, and then, after ordering the other boys to leave, by having sexual intercourse with her. The state urges that Smith's criminal commission of sexual acts with an underage victim, in concert with two other individuals, should not be rewarded with a downward departure sentence in contravention of the legislature's stated public policies.
The State principally urges that section 800.04, Florida Statutes (1993), the statute which Smith was convicted of violating, is designed to protect children from sexual acts performed on them by adults, regardless of their consent. See State v. Johns, 576 So.2d 1332 (Fla. 5th DCA 1991); State v. Sorakrai, 543 So.2d 294 (Fla. 2d DCA 1989); L.L.N. v. State, 504 So.2d 6 (Fla. 2d DCA 1986), review denied, 511 So.2d 299 (Fla.1987). Additionally, section 794.023, Florida Statutes (1993) mandates an enhanced penalty for acts of sexual battery committed by more than one person based upon a public policy that such acts are a danger to the public and offensive to civilized society.
We recognize that, in Johns, this court said in dicta that a victim's consent may, under appropriate circumstances, be considered by a trial court in imposing a downward departure sentence. Notably, however, the panel declined to permit a downward departure in Johns even though the victim was a fourteen-year old engaged in prostitution. Although the hypothetical circumstances involving consent that the panel in Johns may have envisioned are unknown, there is nothing in this case that indicates a result different from the one reached by the Johns court. Smith's argument that the departure is justified because this victim was sexually curious whereas the victim in Johns was impelled by economic need is not persuasive. If a child's consent to sex is a basis to depart in this case, it would be so in virtually any case. Indeed, this case presents exactly the sort of behavior by adults the statute is designed to prohibit.
In Jones v. State, 640 So.2d 1084 (Fla. 1994), the supreme court recently answered a certified question deeming section 800.04, Florida Statutes to be constitutional. In doing so, the court reaffirmed the strong public policy interest in protecting minors from such sexual conduct:
As evidenced by the number and breadth of the statutes concerning minors and sexual exploitation, the Florida Legislature has established an unquestionably strong policy interest in protecting minors from harmful sexual conduct. As we stated Schmitt v. State, 590 So.2d 404 (Fla. 1991), cert. denied, 503 U.S. 964, 112 S.Ct. 1572, 118 L.Ed.2d 216 (1992), "any type of sexual conduct involving a child constitutes an intrusion upon the rights of that child, whether or not the child consents ... [S]ociety has a compelling interest in intervening to stop such misconduct." Id. at 410-11. In Schmitt the issue involved the constitutionality of a statute making it unlawful to possess material depicting sexual conduct by children. The issue in the instant case involves the constitutionality of a statute making it unlawful to have sexual intercourse with a child under the age of sixteen. In both of these cases, the State intervened in an effort to protect the health, safety, and welfare of children who are inevitably vulnerable to the sexual misconduct of others.
The district court stated that it would seem "disingenuous" to rely on Schmitt for the conclusion that "anytime a minor is seduced, sexual exploitation has occurred." [Jones v. State,] 619 So.2d [418] at 420 n. 2 [Fla. 5th DCA 1993]. We are of the opinion that sexual activity with a child opens the door to sexual exploitation, physical harm, and sometimes psychological damage, regardless of the child's maturity or lack of chastity. Therefore, in the instant case, it is appropriate to consider the child protection policies discussed in Schmitt. The petitioners argue that the statute is unconstitutional as applied because the girls in this case have not been harmed; they wanted to have the personal relationships they entered into with these men; and, they do not want the "protections" advanced by the State. However, neither *644 the level of intimacy nor the degree of harm are relevant when an adult and a child under the age of sixteen engage in sexual intercourse. The statutory protection offered by section 800.04 assures that, to the extent the law can prevent such activity, minors will not be sexually harmed. "[S]exual exploitation of children is a particularly pernicious evil that sometimes may be concealed behind the zone of privacy that normally shields the home. The state unquestionably has a very compelling interest in preventing such conduct." 590 So.2d at 410.
The State has the prerogative to safeguard its citizens, particularly children, from potential harm when such harm outweighs the interests of the individual. Griffin v. State, 396 So.2d 152 (Fla.1981).
Despite its intimate character, sexual conduct is highly regulated activity. At any given point, the picture that emerges of the complex web of legal regulation is impressionistic, and some features are difficult to discern. The law of sex, however, can operate as a value generating force when those who create or who are governed by it perceive in the law an underlying vision of appropriate sexual conduct.
Martha Chamallas, Consent, Equality, and the Legal Control of Sexual Conduct, 61 S.Cal.L.Rev. 777, 777 (1988). The legislature enacted section 800.04 based on a "morally neutral judgment" that sexual intercourse with a child under the age of sixteen, with or without consent, is potentially harmful to the child. Stall [v. State], 570 So.2d [257] at 267 [(Fla.1990)] (quoting Paris Adult Theatre I v. Slaton, 413 U.S. 49, 69, 93 S.Ct. 2628, [2641-42,] 37 L.Ed.2d 446 (1973)). Although the right to be let alone protects adults from government intrusion into matters relating to marriage, contraception, and abortion, the State "may exercise control over the sexual conduct of children beyond the scope of its authority to control adults." Anderson v. State, 562 P.2d 351, 358 (Alaska 1977) (upheld statute prohibiting fellatio with a child under sixteen years of age, regardless of consent).
* * * * * *
The rights of privacy that have been granted to minors do not vitiate the legislature's efforts and authority to protect minors from conduct of others. We agree with Judge Sharp and the legislature that Florida has an obligation and a compelling interest in protecting children from "sexual activity and exploitation before their minds and bodies have sufficiently matured to make it appropriate, safe and healthy for them." 619 So.2d at 424 (Sharp, J., concurring specially.)
Jones, 640 So.2d at 1085-1087 [footnotes omitted]. Given this policy, it is inconceivable that the key feature of this criminal statute, i.e. irrelevancy of the child's consent to sex, would nevertheless be a basis to disregard the statutorily prescribed penalty for its commission. Although the lower court was thoughtful in deciding upon the sentence imposed, we conclude the lower court erred.
Departures from the sentencing guidelines should be avoided unless there are clear and convincing reasons to warrant aggravating or mitigating a sentence. State v. Mischler, 488 So.2d 523, 524 (Fla.1986). Whether this case runs afoul of the supreme court's prohibition against using an inherent component of the crime as a basis for departure requires consideration of whether the irrelevance of consent as a defense is an inherent component of the crime. In Mischler, the court had before it an upward departure. For purposes of considering a downward departure, the statutory irrelevance of a particular defense certainly seems to match the higher court's intent, if not its exact words. See 488 So.2d at 523. Nor logically could the victim's consent to different sex acts with other minors meet the statutory test requiring a factor that would reasonably justify mitigation. § 921.001(5), Fla.Stat. (1993). Accordingly, we vacate the downward departure sentence and remand for resentencing within the guidelines.
Judgment AFFIRMED; sentence VACATED and REMANDED.
GOSHORN and THOMPSON, JJ., concur.