NORTHCUTT, J.,
Dissenting.
I admit to feeling more than a little trepidation at the prospect of disagreeing with my colleagues on this issue, for they are in good company. A number of courts across the nation have concluded that juvenile curfew laws similar to this one are constitutional. But, as the majority acknowledges, those conclusions have not been easily reached, nor have they been unanimous. I believe that Pinellas Park’s juvenile curfew ordinance infringes two fundamental rights, that therefore it must be strictly scrutinized, and that it fails that scrutiny. But even if such laws are entitled to a lessened “intermediate” level of scrutiny, this ordinance does not withstand it.
I am persuaded that in our free society individuals generally have a fundamental right to move about unfettered by government edicts on when, where, and why they may come or go. See Hutchins v. District of Columbia, 188 F.3d 531, 560-563 (D.C.Cir.1999) (en banc) (Rogers, J., concurring in part and dissenting in part); *1151 Nunez by Nunez v. City of San Diego, 114 F.3d 935, 944 (9th Cir.1997). I also believe that children have this same fundamental right. See Hutchins, 188 F.3d at 557-560 (Rogers concurring in part and dissenting in part); Nunez. To be sure, there are important reasons why in some cases the government may intrude upon children’s rights to a greater extent than it might on adults’. See Bellotti v. Baird, 443 U.S. 622, 634, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). But such factors do not diminish the fundamental nature of children's rights. Rather, they form the basis for the compelling interest which, under the strict scrutiny standard, is a prerequisite to government restrictions on the exercise of any fundamental right. See Nunez, 114 F.3d at 945. Were it otherwise, the mere recitation of a compelling government interest could always undermine strict judicial scrutiny of a law that burdens a fundamental right because the right would be reclassified as something less than fundamental. Because Pinellas Park’s curfew ordinance restricts juveniles’ exercise of their fundamental rights to move about, it must be subject to the strictest standard of scrutiny. See Hutchins, 188 F.3d at 570-571 (Tatel, J., dissenting); Nunez, 114 F.3d at 946.
Strict scrutiny also is mandated because the ordinance intrudes upon the right to make parental decisions without government interference, a fundamental right in itself under the federal and Florida constitutions, and an aspect of Florida’s explicit constitutional right of privacy. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Beagle v. Beagle, 678 So.2d 1271 (Fla.1996). The majority notes, but does not resolve, the question of whether the juvenile defendants in this case have standing to assert the rights of their parents in this regard. This question misses the point, especially given that one of the asserted justifications for the ordinance is its alleged enhancement of parents’ control of their children. That assertion, assuming as it does that the government may elect to criminalize a child’s decision whether to obey or disobey his parents’ instructions, underscores the importance of the child’s direct interest in the balance among his own rights, his parents’ right to parent, and the government’s interest in protecting his welfare. See Jones v. State, 640 So.2d 1084, 1085 (Fla.1994). Therefore, the juveniles in this case do have standing to complain that the ordinance intrudes upon fundamental parenting rights, and that intrusion subjects the ordinance to strict scrutiny. See Nunez; Hutchins, 188 F.3d at 570-571 (Tatel, J., dissenting); Beagle; Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla.1985).
Still, for purposes of this discussion I will accept that the curfew ordinance may be reviewed under the intermediate scrutiny standard. I acknowledge and applaud the fact that government has a compelling interest in protecting the welfare of children. Certainly, then, I agree with the majority that Pinellas Park’s juvenile curfew ordinance satisfies the lesser “important interest” requirement of intermediate scrutiny. But I dispute the majority’s conclusion that this ordinance can be deemed “substantially related” to that interest in a constitutional sense.
On this question, there are three asserted justifications for this ordinance. In my assessment of their ascending order of validity, they are: (1) enhancement of parental control of children; (2) juvenile crime prevention; (3) prevention of child victimization.
I reject outright the oft-made suggestion that ordinances such as this one enhance parents’ control of their children, for such falsely implies that parents have some choice in the matter. To the contrary, this ordinance prescribes what parents must or must not permit or direct their children to do, on pain of criminal prosecution. To characterize this as anything other than the government’s substitution of its own *1152 judgment for that of parents is rather cynical. See Nunez, 114 F.3d at 952 (characterizing curfew as “not a permissible ‘supportive’ law, but rather an undue, adverse interference by the state”). This can be appreciated simply from the fact that it would be possible for a child to violate the ordinance by obeying even the most innocent parental directive, e.g., that he perform a non-emergency errand such as walking the family dog around the block during curfew hours. There simply is no logical relationship between the ordinance and the enhancement of parental control of their children.
Of the assertion that the ordinance prevents or reduces juvenile crime, I am less dubious, but only by degrees. From one perspective, I doubt that the government’s interest in protecting the community from juvenile crime truly is any greater than its interest in protecting against crime generally; in this vein, the majority’s suggestion that the curfew permits police to intervene before juveniles commit crimes simply confirms that the ordinance is untenably over-inclusive. See Papachristou v. City of Jacksonville, 405 U.S. 156, 171, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (rejecting attempt to justify vagrancy ordinance as permitting crime to be “nipped in the bud”); Nunez, 114 F.3d at 948. In the context of the government’s important interest in protecting children’s welfare, however, I agree that it is in children’s best interests to abide by the law.
Even so, the majority’s assessment of this justification for the ordinance is undermined by the lack of a meaningful factual basis. Recall that the substantial relationship requirement of intermediate scrutiny in part turns on an examination of the factual premises on which the decision to enact the ordinance was based. See Hutchins, 188 F.3d at 542. Manifestly, the majority’s reference to statistics compiled after the ordinance went into effect has no bearing on this question. Beyond that, our record contains nothing to indicate whether Pinellas Park had a particularly vexing juvenile crime problem when it decided to enact the curfew, whether the juvenile crime rate was increasing or decreasing, whether crimes were being committed by a large number of youths or only by a relative few, and so forth.
Even treating the indisputable fact that some, or even many, juveniles commit crimes as an adequate factual premise for some sort of legislative intrusion into juveniles’ fundamental rights, as a logical matter-the second aspect of the substantial relationship inquiry-I question whether interning our youth effectively serves that interest. Certainly, the ordinance is not likely to deter juveniles who venture into the night bent on committing crimes; if they are willing to risk the penalties for those crimes, they are unlikely to be daunted by the relatively lenient penalties associated with violating a curfew. See Nunez, 114 F.3d at 948. Ironically, then, the ordinance likely has its greatest impact on law-abiding youths, a result which bears no logical connection to the purpose of preventing juvenile crime.
Neither do the post-ordinance statistics mentioned by the majority establish a logical connection between the ordinance and the reduction of juvenile crime. The statistics, compiled and submitted in a report by the Pinellas Park Police Department, were in two parts, each of which compared data from a six-month period in 1996, prior to the enactment of the ordinance, to the same period in 1997, after the ordinance went into effect. The first group of statistics broadly compared “certain crimes/ codes which are sometimes associated with juvenile activity” during the two time frames. The comparisons were made without regard to the time of day the crimes were committed, and for that reason alone are useless in establishing a logical nexus between the ordinance and its purpose. Moreover, four of the five listed crimes-graffiti, burglary to vehicle, grand theft auto, and burglary to residence-all can be committed by persons aged 18 or older, thus further reducing the *1153 efficacy of this evidence. The statistics showed that three of those crimes declined in number during the post-ordinance period. Burglaries to residences increased. Ironically, so did the fifth category mentioned-“runaway”-which was the only one capable of being committed only by juveniles.
The remainder of the statistical evidence measured “juvenile contacts” during the same two periods, between the hours of 11 p.m. and 6 a.m. Limited as such, these numbers appear to be more helpful. They reflected an overall increase in juvenile contacts, from 620 in 1996 to 660 for the same period in 1997, but the majority correctly points out that the latter figure included 355 curfew violations. If they are disregarded, the number of pertinent contacts in 1997 numbered 305.
Although this would seem to be a dramatic difference, some qualifications must be kept in mind. For one thing, the 1996 figures surely included a number of contacts that would have been characterized as curfew violations if one had been in place at that time. For example, the largest category of contacts in 1996 was for “field interrogation reports.” (There were 173 of these in 1996, and 19 in 1997.) The same might be said of many of the 65 contacts that were subclassified as “suspects” in the general category “burglary/trespassing/loitering” in 1996. Also, some of the measured categories had no bearing when assessing the crime prevention efficacy of restricting juveniles to their homes, e.g., “information reports,” “warrants served,” “counterfeiting,” and “harassing phone calls.” In addition, although the report divided eight categories of juvenile contacts into the subcategories “suspects,” “victims,” “witnesses,” and “others,” it made no such distinctions in the other 29 categories. For that reason, an increase or decrease in “juvenile contacts” in those categories-or in the overall totals-did not mean there had been an increase or decrease in juvenile crimes. For that matter, the statistics did not even reveal how many individual juveniles accounted for the contacts.
In part because of those failings, and in part aside from them, the statistics relied upon by the majority do not, in themselves, furnish any basis for logically connecting a suspected decline in juvenile crime to the curfew ordinance. See Craig v. Boren, 429 U.S. 190, 201, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (decrying the “unduly tenuous fit” between state law permitting women to consume low-alcohol beer at a younger age than men, and the state’s statistics tendered in support of the statute). If there were fewer juvenile crimes in Pinellas Park, this simply may have been because juvenile crime rates have declined generally, or because of a combination of other factors wholly unconnected with the ordinance-such as a decline in the city’s juvenile population; or a decline in another population that is particularly susceptible to crime; or a change in the size, activity, or effectiveness of the police force; or the apprehension of a relatively small number of youths, gang members perhaps, who were responsible for a disproportionate number of crimes during the earlier period.
All of the foregoing is also true as regards the third, and what I consider the most important and defensible, justification for the curfew ordinance, that being the prevention of child victimization. Again, even assuming a factual premise underlying the City’s decision to enact the ordinance, our record does not establish a logical connection between the ordinance and its purpose; the statistics measuring juvenile contacts suffer from the same infirmities in this context as they do with respect to the prevention of juvenile crime. (They also reflect that, after the ordinance took effect, the number of juveniles victimized by two especially pernicious crimes against children, “domestic violence” and “child abuse/lewd acts,” rose by 75 percent and 80 percent, respectively.)
Finally, in regard to the third aspect of the substantial relationship test, I do not dispute the majority’s view that the exeep- *1154 tions provided in the ordinance substantially narrow the “scope of the remedy employed.” See Hutchins, 188 F.3d at 542. But the inquiries necessary to establish a substantial relationship between the ordinance and the government’s important interest in preventing juvenile crime and victimization are interrelated. Id. Unsupported by any meaningful factual premise or logic, an ordinance that constrains the rights of all citizens of a certain age to leave their homes for nearly a third of every day is remarkably sweeping.
Having said these things, I acknowledge that the substantial connection prong of the intermediate scrutiny standard does not require a “precise fit” between the ordinance and the important government interest it is intended to promote. See Hutchins, 188 F.3d at 543. However, if intermediate, scrutiny truly is heightened beyond the mere rational basis test, it demands more than a mere intuitive connection between them. See Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 726, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (observing that under intermediate scrutiny the legislative analysis behind a law must be “reasoned”, and judicial analysis of the law must be “searching”).
Like any other person of normal sensibilities, I surmise that confining young people to their homes at night lessens the chance that they would commit or fall victim to crimes. As a parent, I may rightfully weigh these concerns along with my assessment of my child’s maturity and judgment, prescribe rules accordingly, and enforce them in the manners afforded by the dynamics of our relationship. But under our constitutions the government’s authority is not nearly so broad. When it ventures to impair a fundamental right, and to enforce that impairment with its powers to arrest and to prosecute, it must justify its edict by something more than surmise or intuition.